UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| MUNICIPIO AUTONOMO DE PONCE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al,<br><br>Defendants. | Civil No. 14-1502 (JAF) |

**OPINION AND ORDER**

Plaintiffs Municipio Autónomo de Ponce (the municipality of Ponce, henceforth, "Ponce"), Centro Deambulantes Cristo Pobre, Inc., Lucha Contra el SIDA, Inc., Iniciativa Comunitaria, Inc., Itcia Hernández-Laboy, Jorge Ortiz-Torres, José Alvarez-Medina, and Hogar Crea Posada La Esperanza (collectively "Plaintiffs") are suing Defendants U.S. Office of Management and Budget ("OMB"); Brian Deese, Acting Director of OMB; U.S. Department of Health and Human Services ("HHS"); Sylvia Mathews Burnwell, Secretary of HHS; U.S. Health Resources and Services Administration ("HRSA"); and Mary Wakefield, Administrator of HRSA (collectively "Defendants").

The action arises out of the Public Health Service Act (PHSA), 42 U.S.C. § 300ff-11 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. (Docket No. 1 at 5.) Plaintiffs invoke jurisdiction under 28 U.S.C. §§ 1331, 1361, 2201, and 2202. (Docket No. 1 at 5.) They state that: "Defendants HHS/HRSA's use of the wrongly delineated Ponce metropolitan statistical area (MSA) by OMB lead HHS/HRSA to

conclude that the Ponce [transitional grant area or "TGA"] does not qualify with the Ryan White Legislation's Part A TGA eligibility criteria." (Docket No. 29 at 1.)[1]

This litigation exemplifies the difficult cases that District Court judges constantly face. The nature, essence, and value of evidence and the presentation of legal arguments from both parties leave enormous lagoons. Yet, delaying resolution of this case will affect a disadvantaged population. In the end, we have carefully sifted through the available record and had to unravel the mishmash as best we could. We understand that this case will proceed before the Court of Appeals, and three other jurists will examine the issue. We invite the First Circuit to recognize the faux pas of the system and the insufficiency in briefing while evaluating the case.

For the following reasons, we grant in part and deny in part Plaintiffs' motions. We deny Plaintiffs' request for Fiscal Year 2014 funds. However, we grant Plaintiffs' request for a declaration that the current boundaries are unlawful.

I.

**Procedural History**

On June 24, 2014, Plaintiffs filed a complaint against Defendants alleging that under the Ryan White CARE (Comprehensive AIDS Resources Emergency) Act (Public Law 101-381) (henceforth, "Ryan White legislation"), the Ponce boundaries were drawn in an arbitrary and capricious manner. (Docket No. 1.) Plaintiffs ask that we "order

---

[1] The Ryan White legislation (Public Law 101-381) provides "emergency assistance to localities that are disproportionately affected by the Human Immunodeficiency Virus epidemic." 42 U.S.C. § 300ff. Part A of the legislation provides funding to eligible metropolitan areas ("EMAs"). 42 U.S.C. § 300ff-11. If a metropolitan area does not have enough cases to qualify as an EMA, it can qualify as a "transitional area" (also known as a transitional grant area, or "TGA"). The Office of Management and Budget draws boundary lines called Metropolitan Statistical Areas ("MSAs.") (Docket No. 42-2 at 18.) These MSAs were largely used to draw the boundaries for the Ryan White legislation. (Docket No. 42-2 at 18.)

HHS/HRSA to immediately cease and desist to use the Ponce MSA as wrongly delineated by OMB, consider the correctly delineated Ponce MSA instead, stay the closing of the Ponce TGA, and secure and grant the funds necessary to continue the operation of the Ponce TGA fiscal year 2014 budget period." (Docket No. 1 at 5.) Plaintiffs invoke the Public Health Service Act (PHSA), 42 U.S.C. § 300ff-11 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, as well as 28 U.S.C. §§ 1331, 1361, 2201, and 2202. (Docket No. 1 at 5.)

The same day, Plaintiffs filed a motion for a temporary restraining order pursuant to Fed. R. Civ. P. 65(b), asking us to state that OMB and HHS/HRSA shall be immediately enjoined to maintain the status quo and to allow the Ponce TGA to continue operating pending this litigation. (Docket No. 2 at 15.) Plaintiffs also requested an evidentiary hearing pursuant to Fed. R. Civ. P. 65(a). (Docket No. 2 at 15.) Plaintiffs asked us to "Order OMB to correctly delineate the Ponce MSA to add the municipalities of Adjuntas, Santa Isabel and Coamo"; to "Order HHS/HRSA to evaluate the Municipality's pending grant application taking into consideration the correctly delineated Ponce MSA"; and to "Order HHS/HRSA to set aside the funds totaling $3,592,335.00 requested by the Municipality to operate the Ponce TGA under the Ryan White Part A HIV Emergency Relief Grant Program for fiscal year 2014-2015 pending this litigation." (Docket No. 2 at 16.) Defendants opposed the Plaintiffs' motion on June 26, 2014. (Docket No. 11.)

On June 27, 2014, we held a Show Cause Hearing. Factual issues of the case were discussed and the parties presented legal arguments. Defendants agreed to grant a second

non-cost extension until August 10, 2014, provided that Plaintiffs submit a proper request. The parties agreed that the matter could be resolved on paper, and we accepted the invitation to hold back on temporary disposition of the matter and give the parties a formal decision. (Docket Nos. 12, 13.) In that sense, the parties obviated the consolidation process under Fed. R. Civ. Pro. 65. The parties had "clear and unambiguous notice" of our intent to fully decide this matter in controversy, and we allowed the parties to proceed with sufficient time to "assemble and present their evidence." *See Aponte v. Calderón*, 284 F.3d 184, 190 (1st Cir. 2002) (internal citation omitted). Neither party objected to this procedure. They voluntarily submitted the case on paper. Plaintiffs asked to submit additional documents into the record, and the Government had no objection. (Docket No. 12.) Plaintiffs then submitted voluminous documents into evidence. (Docket Nos. 17-27.) Following Plaintiffs' formal request, Defendants granted the non-cost extension on July 2, 2014. (Docket No. 28.)

On July 4, 2014, Plaintiffs submitted a "Response in Opposition to Motion Opposing Request for Temporary Restraining Order or Preliminary Injunctive Relief." (Docket No. 29.) Plaintiffs again state that: "Defendants HHS/HRSA's use of the wrongly delineated Ponce metropolitan statistical area (MSA) by OMB lead HHS/HRSA to conclude that the Ponce TGA does not qualify with the Ryan White Legislation's Part A TGA eligibility criteria." (Docket No. 29 at 1.) On July 11, 2014, Defendants submitted a memorandum in opposition to injunctive relief. (Docket No. 32.) On July 31, 2014, we ordered HHS to immediately inform the court "the details of how the Ponce geographical area was defined in 1994." We were interested in the document,

documents, or memoranda that consigned, in 1994, the rational process behind that geographical decision, and we noted in our order that HHS should have that information, as CDC is a division of HHS. (Docket No. 41.) Defendants submitted a motion in compliance with our order. (Docket No. 42.) However, no information and no basis, rational or otherwise, was presented on the subject, and there was nothing to review regarding the 1994 geographical decision.

## II.

## **Factual History**

Congress enacted the Ryan White legislation (Public Law 101-381) on August 18, 1990. It has since been amended and reauthorized four times. (Docket No. 1 at 14.) The legislation provides "emergency assistance to localities that are disproportionately affected by the Human Immunodeficiency Virus epidemic." 42 U.S.C. § 300ff. Part A of the Ryan White legislation provides funding directly to eligible metropolitan areas (EMAs) who meet threshold levels of AIDS cases.  42 U.S.C. § 300ff -11.[2] A metropolitan area with slightly fewer living cases can qualify as a "transitional area" (also known as a transitional grant area, or "TGA"). To qualify as a TGA, the area must be

> a metropolitan area for which there has been reported to and confirmed by the Director of the Centers for Disease Control and Prevention a cumulative total of at least 1,000 but fewer than 2,000 cases of AIDS during the most recent period of 5 calendar years for which such data are available.

---

[2] The statute differentiates between AIDS and HIV. AIDS is defined as "acquired immune deficiency syndrome." Human immunodeficiency virus is defined as "the etiologic agent for AIDS." Finally, the statute defines "HIV/AIDS" as a term that "means HIV, and includes AIDS and any condition arising from AIDS." 42 U.S.C. § 300ff-88.

42 U.S.C. § 300ff-19(b). The TGA ceases to qualify as such when,

> the metropolitan area fails, for three consecutive years -- (i) to qualify under such subsection as a transitional area; and (ii) subject to subparagraphs (B) and (C), to have a cumulative total of 1,500 or more living cases of AIDS (reported to and confirmed by the Director of the Centers for Disease Control and Prevention) as of December 31 of the most recent calendar year for which such data are available.

42 U.S.C. § 300ff-19(2)(A). The Ryan White program is administered by the Secretary of HHS, acting through the Administrator of HRSA. 42 U.S.C. § 300ff-19(a).

In each of the fiscal years 1993 through 2006, Ponce qualified as an EMA and received grant funding. In 2006, HHS reduced Ponce to TGA status. (Docket No. 1 at 18.) On June 24, 2008, HHS wrote to the Director of the Ponce region, stating that Ponce failed to meet the statutory criteria for a TGA and that if it failed to meet the criteria for two more consecutive fiscal years, it would lose eligibility for Part A funding. (Docket No. 27-1.) On August 12, 2009, HHS wrote a similar letter. (Docket No. 27-2.) On October 15, 2012, HHS wrote to the mayor of Ponce stating that the Ponce area "failed for the third consecutive year to meet mandated eligibility criteria for receiving TGA grant funds," and, therefore, would no longer qualify for funding after Fiscal Year 2013. (Docket No. 27-3 at 1.)

On December 18, 2012, the Resident Commissioner of Puerto Rico to the United States Congress wrote to the Secretary of HHS expressing his concern about the decision to terminate TGA funding for Ponce.[3] The Resident Commissioner argued that HRSA

---

[3] Rather than a voting member of Congress, Puerto Rico elects a non-voting Resident Commissioner of Puerto Rico to the United States Congress. 48 U.S.C. § 891.

incorrectly interpreted the Ryan White Act and that the loss of funding for the Ponce area would have negative consequences for the HIV/AIDS treatment efforts in Puerto Rico. (Docket No. 27-4.)  The Secretary of HHS responded to the Resident Commissioner's letter on February 12, 2013, affirming the prior determination.  (Docket No. 27-5.)  On June 24, 2013, the Director of the Division of Metropolitan HIV/AIDS Programs wrote a letter to the mayor of Ponce stating that Ponce was no longer an eligible grantee and detailing closeout processes.  (Docket No. 27-6.)

On September 27, 2013, the mayor of Ponce wrote to the Secretary of HHS and to the Administrator of HRSA disagreeing with the cancellation of the Part A grant, and arguing that the boundaries of the Ponce area were "erroneously comprised."  In the letter, the mayor requested reconsideration, an administrative hearing, and a stay on the closing of the program. (Docket No. 27-7.)  On or around October 1, 2013, the mayor of Ponce travelled to Washington, D.C., to attend a meeting with the Director of the HRSA's Division of Metropolitan HIV/AIDS Programs, but the Director cancelled their scheduled meeting.  (Docket No. 29 at 5.)  The mayor wrote HHS another letter dated November 18, 2013. (Docket No. 27-10.)  On November 21, 2013, the Administrator of HRSA wrote a response reaffirming the current boundaries and reiterating that the Ponce area would lose Part A funding.  (Docket No. 27-11.)  The record shows that the requested hearing was never held, and no administrative decision post-hearing has been brought to our attention.  According to Defendants, the Ryan White HIV/AIDS Program does not establish an administrative procedure for review of eligibility determinations. (Docket No. 32-3 at 5.)

On December 17 and 18, 2013, the mayor met with members of the U.S. Congress and their staff. She also met with the Executive Director of the President's Task Force on Puerto Rico to discuss Part A funding. (Docket No. 29 at 5.) On January 7, 2014, the mayor met with the Administrator of HRSA. (Docket No. 29 at 6.) On February 27, 2014, the Chairman of the Senate Health, Education, Labor and Pensions (HELP) Committee wrote a letter to the Administrator of HRSA arguing that Ponce should not lose Part A funding. (Docket No. 27-12.)

On June 24, 2014, Plaintiffs filed the current lawsuit. (Docket No. 1.)

### III.

### **The Drawing of Boundaries Under the Ryan White Care Act**

Throughout this case, it has been impossible to discover how the boundary lines were originally drawn for these metropolitan areas. The Ryan White legislation was enacted on August 18, 1990 (Public Law 101-381). (Docket No. 29 at 7.) Part A authorizes grants to EMAs. The 2006 reauthorization establishes a separate grant program for TGAs. 42 U.S.C. § 300ff-19(b). The 2006 reauthorization states that EMA boundaries "shall be the boundaries that were in effect for such area for fiscal year 1994." 42 U.S.C. § 300ff-11(c)(1). The 2006 reauthorization did not define the boundaries of a TGA. For programmatic continuity, HRSA retained the historical boundaries for all TGAs that had formerly been EMAs. (Docket No. 32 at 5.)

The Ryan White legislation defines a "metropolitan area" as "an area that is referred to in the HIV/AIDS Surveillance Report of the Centers for Disease Control and Prevention as a metropolitan area" over a threshold population. 42 U.S.C. § 300ff-17(2).

The CDC HIV/AIDS Surveillance Report issued July 1993, which set the historical boundaries, states that:

> The Office of Management and Budget announced new Metropolitan Statistical Area (MSA) definitions […] The metropolitan area definitions are the MSAs for all areas except the 6 New England states. *For these states, the New England County Metropolitan Areas (NECMA) are used.*

(Docket No. 42-2 at 18)(emphasis supplied).

Defendants argue that "[n]on-statistical programs, such as the Ryan White HIV/AIDS Program, are not legally obliged to utilize OMB's delineations and are not bound by said delineated statistical areas." (Docket No. 11 at 2.) In fact, Defendants cite to OMB Bulletin 13-01, in which OMB cautions that these "areas should not serve as a general purpose geographic framework for nonstatistical activities;" and that if an agency elects to use these delineations in nonstatistical programs, "it is the sponsoring agency's responsibility to ensure that the delineations are appropriate for such use." (Docket No. 11 at 7-8.) OMB issued a Notice on June 28, 2010 which stated in italicized text that *"[t]hese areas are not designed to serve as a general-purpose geographic framework applicable for nonstatistical activities or for use in program funding formulas*." (Docket No. 26-2)(emphasis in original).

Defendants argue that they exercised discretion by applying the historical – rather than the current -- OMB MSA boundaries to avoid funding disruptions to existing grantees and their established HIV care systems. (Docket No. 11 at 15.) However, Defendants make no argument as to why the original OMB MSA boundaries were

appropriate without modification for all areas other than New England.[4] Therefore, we ordered HHS to inform the court of "the details of how the Ponce geographical area was defined in 1994." We stated that we were interested in "the document, documents or memoranda that consigned, in 1994, the rational process behind that geographical definition. We are aware that HHS relied on CDC input, but CDC is part of HHS." (Docket No. 41.)

In its response, HHS wrote that "the historical data housed both at CDC and the Health Resources and Services Administration is not accessible," and that "[a]ll historical documents that may pertain to the agency selection of the 1993 OMB bulletin have been disposed of in compliance with the applicable records retention schedules." (Docket No. 42 at 3-4.)[5]

Plaintiffs have argued that the boundaries for Ponce were not well-drawn because there is a very high level of social and economic integration between Ponce[6] and the municipalities of Adjuntas, Santa Isabel, and Coamo. (Docket No. 26-6 at 16.) Adjuntas has a twenty-three percent commuting measure with Ponce; Santa Isabel has a nineteen percent commuting measure with Ponce; and Coamo has an eleven percent commuting measure. (Docket No. 26-6 at 16.) For the sake of reference, Plaintiffs include commuting measures for nine municipalities in the San Juan EMA that have a ten percent commuting measure or less. (Docket No. 26-6 at 4.) Plaintiffs also submitted data from

---

[4] Contrary to Puerto Rico, the New England states have strong nationally-recognized political support from senators and congressmen.
[5] Throughout its submission, Defendants speak of the 1993 OMB bulletin and the 1993 OMB delineations. (*See* Docket No. 42.) Therefore, we assume that the 1993 OMB delineations were the basis for the 1994 boundaries.
[6] Ponce is the second-largest city in Puerto Rico, followed by Mayagüez. San Juan is the largest and capital city of the island territory.

the Puerto Rico Department of Health.  The Puerto Rico Department of Health defines the Ponce region as fifteen municipalities, including Adjuntas, Santa Isabel, and Coamo.  (Docket Nos. 27-13, 40-1.)  This serves as evidence that in Puerto Rico, there is a logic as to what constitutes the Ponce region.  Drawn according to patterns of socio-economic integration and local government delineations, the Ponce region has a much higher population than the region that HHS recognizes.

Neither party argues that there was a demographic shift in Puerto Rico.  HHS fails to explain why only the New England states drew boundaries that were different from the OMB MSAs.

## IV.

## **Other Considerations**

Defendants argue that Plaintiffs are not facing irreparable harm because two Part C grants were awarded in the amounts of $660,000 and $440,000 for use in Ponce and because there are still Part-A-funded clinics in the San Juan area. (Docket No. 11 at 17.) However, if this year serves as a benchmark, the parties dispute a recurring grant of about $3,592,335 per year. (Docket No. 2 at 16.)  The awarded Part C grants cover just under a third of that amount.  As for distance, from the farthest part of the Ponce MSA to San Juan, the commute by car is two to three hours.  There are no public transportation routes.  Driving Directions from Guánica to San Juan, PR, Google Maps, http://maps.google.com

(follow "Get Directions" hyperlink; then search "A" for "Guanica, Puerto Rico" and search "B" for "San Juan, Puerto Rico"; then follow "Get Directions" hyperlink).[7]

Further, Plaintiffs submitted information regarding the scope of the epidemic in Puerto Rico. As noted in their exhibits, "Puerto Rico has a particularly high HIV/AIDS infection rate. Additionally, the HIV death rate is nearly four times higher than the U.S. national rate." (Docket No. 27-12.)

We bear in mind these additional considerations as we analyze whether HHS acted in a way that was arbitrary and capricious.

## V.

## **Mootness**

Defendants submitted evidence from the Deputy Associate Administrator of HRSA's HIV/AIDS Bureau, stating that "[a]ll funds appropriated by Congress for Part A grant awards in FY 2014 were awarded effective March 1, 2014." (Docket No. 11-1 at 4). Therefore, Defendants argue that any claims based on Fiscal Year 2014 funding are barred by the Appropriations Clause of the U.S. Constitution and the doctrine of mootness. (Docket No. 11 at 4.) Plaintiffs state that money remains for Part A funds, but do not provide any support for this proposition. (Docket No. 29 at 17.)

The First Circuit has not squarely addressed whether Plaintiffs can recover on funding appropriations that have already been spent. However, the Second Circuit has stated in the context of such Ryan White grants that "[w]here, as here, the congressional appropriations relating to the funds sought by private litigants have been lawfully

---

[7] Most members of the federal judiciary within the First Circuit are fully aware of the inconvenience of travelling from San Juan to the Ponce region and vice versa unless private privileged transportation is involved.

distributed – and therefore exhausted – by a federal agency, courts lack authority to grant effectual relief in the context of an Article III case or controversy." *County of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 138 (2nd Cir. 2010). The District of Columbia Circuit likewise ruled that "when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation," and, thus, found the city's claims for injunctive and monetary relief to be moot. *City of Houston, Tex. v. Dep't of Housing and Urban Development*, 24 F.3d 1421, 1424 (D.D.C. 1994).

We find these cases persuasive and hold that we lack jurisdiction over claims related to Fiscal Year 2014 funding under the Ryan White legislation. However, this does not moot the question of boundaries for future years.

## VI.

## Arbitrary and Capricious Review

When reviewing an agency's construction of a statute, the court must first confront two questions under the *Chevron* doctrine. We must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. F.C.C.*, 133 S.Ct. 1863, 1868 (2013) (quoting *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43). However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting 467 U.S. at 843). *Chevron* provides

the background presumption that "[s]tatutory ambiguities shall be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency." *Id.* Neither party argues that there is ambiguity in the text of the Ryan White legislation. The statute clearly gives CDC authority to draw boundaries, but does not lay out guidelines in drawing those boundaries. *See* 42 U.S.C. § 300ff-17(2).

After resolving questions of statutory ambiguity, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA") provides the extent of judicial authority "to review executive agency action for procedural correctness." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Under the APA, courts can hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We must "give substantial deference to an agency's interpretation of its own regulations," particularly where the regulation concerns a complex and technical regulatory program. *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994). We allow for "a certain amount of play in the joints" when agencies exercise discretion. *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997). However, courts can and should insist that an agency articulate the reasons behind its decisions. *See Fox Television*, 556 U.S. at 513.

When a legal challenge "really centers on the wisdom of the agency's policy […] the challenge must fail," but only if "the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies." *Lovgren v. Locke*, 701 F.3d 5, 31 (1st Cir. 2012)(internal citations omitted). Put another way, "what matters is that the administrative judgment, right or wrong, derives from the record,

possesses a rational basis, and evinces no mistake of law." *Lovgren*, 701 F.3d at 32 (internal citations omitted). An agency decision fails to pass the arbitrary and capricious test if the administrative record shows that "the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013)(internal citation omitted). Courts cannot "attempt to supply a reasoned basis for the action that the agency itself has not given." *Id*. (internal citation omitted). Rather, the burden is on the agency itself to show "a rational exercise of deliberative decisionmaking." *Assoc. Fisheries*, 127 F.3d at 111.

Although agency action is typically upheld, courts should not "rubber-stamp agency decisions under the guise of 'arbitrary-and-capricious' review." *Com. Of Mass., Dept. of Public Welfare v. Secretary of Agriculture*, 984 F.2d 513, 526 (1st Cir. 1993). Instructive in this regard is the case of *Puerto Rico Sun Oil Co. v. U.S. E.P.A.*, 8 F.3d 73 (1st Cir. 1993), which states that:

> Agencies, after all, are normally entitled to substantial deference […] But in the end an agency decision must also be rational – technically speaking, it must not be "arbitrary or capricious," Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – and that requirement exists even in technical areas of regulation.

*Puerto Rico Sun Oil Co.,* 8 F.3d at 77. To earn judicial deference, an agency must show that its decisionmaking process involved "discussion of relevant issues, consistency with

past practice, [and] avoidance of unexplained discrimination." *Puerto Rico Sun Oil Co.*, 8 F.3d at 77.

Despite our specific order, HHS does not advance any reasons for drawing the original boundaries in this manner, namely, for adopting OMB MSAs wholesale in all areas other than the New England states. To survive arbitrary and capricious review, an agency must avoid "unexplained discrimination." *Puerto Rico Sun Oil Co.*, 8 F.3d at 77. Plaintiffs argue that there is a high level of social and economic integration between Ponce and the disputed municipalities – with nearly a quarter of the population in one disputed municipality commuting to Ponce for work. (Docket No. 26-6 at 4.) Plaintiffs also show that the local government considers the disputed municipalities to be a part of the Ponce region. (Docket Nos. 27-13, 40-1.) Neither party submits evidence that the population has shifted from the time when the original boundaries were drawn. More worrisome, HHS supplies no explanation for allowing the New England states to draw more appropriate boundaries, while shoehorning Puerto Rico into OMB boundaries that arguably do not fit their demographics.

To survive judicial review, HHS must show that it considered "pertinent aspects of the problem." *Atieh*, 727 F.3d at 76 (internal citation omitted); *See also Puerto Rico Sun Oil Co.*, 8 F.3d at 77 (agencies are required to show a "discussion of relevant issues"). Plaintiffs submit evidence that "Puerto Rico has a particularly high HIV/AIDS infection rate [and that] the HIV death rate is nearly four times higher than the U.S. national rate." Defendants elide a response by arguing that care is available hours away in San Juan and that Ponce was recently awarded two significantly smaller grants. (Docket No. 11 at 17.)

1    Puerto Rico, because of its geographic remoteness to the mainland and its lack of
2    complete Congressional representation as a territory, is frequently the object of arbitrary
3    decisions based on lack of knowledge of local conditions. We cannot say it is intentional.
4    It is simply that Puerto Rico is not on the radar screen for bureaucratic agencies. The
5    lack of personal knowledge about Puerto Rico creates an absurd reality that San Juan as a
6    region can basically absorb Ponce. For those unfamiliar with Puerto Rico, a three-hour
7    drive under local traffic conditions is seen as a short distance, local boundary delineations
8    are ignored, and an HIV mortality rate four times higher than the national rate is never
9    addressed. This attitude continues because Puerto Rico is simply a distant, unfamiliar
10   spot to people with no first-hand knowledge of the island. No matter its innocent causes,
11   this failure to make rational, deliberative decisions regarding Puerto Rico is unjust and
12   unacceptable in a democracy, and it has grave consequences for the 3.6 million residents
13   of Puerto Rico.[8]

14   The Supreme Court surprisingly once wrote that Puerto Rico "was foreign to the
15   United States in a domestic sense." *Downes v. Bidwell*, 182 U.S. 244, 341-342 (1901)
16   (White, J., concurring). Such a statement under today's modern optic could constitute a
17   totally unacceptable statement of discriminatory proportions.[9] Soon after, the Jones Act
18   of 1917 granted United States citizenship to the residents of Puerto Rico. 48 U.S.C. §
19   731 et seq.; Jones Act, ch. 145, 39 Stat. 951 (1917). A Resident Commissioner now

---

[8] *See United States Census*, Population Estimates, (http://www.census.gov/popest/data/national/totals/2012/index.html).
[9] The *Insular Cases* decided by the Supreme Court of the United States at the beginning of the twentieth century are, in our view, discriminatory against territorial possessions. *See* Bartholomew H. Sparrow,*The Insular Cases and the Emergence of American Empire* (2006).

represents Puerto Rico as a non-voting member of Congress. 48 U.S.C. § 891. However, as United States Circuit Judge Juan R. Torruella has written, there is still a

> lack of *any* political power by Puerto Rico vis-à-vis the United States. The United States citizens residing in Puerto Rico do not have the right to vote for national offices. Even more importantly, they lack any voting representation in Congress, the body that has plenary power over Puerto Rico and its citizens, and whose enactments permeate every facet of Puerto Rican society. Supreme legislative power therefore lies solely in an institution that enacts laws without *any effective participation or consent* from the U.S. citizens who are obligated to comply with them. Further, this absolute vacuum or deficit of democratic entitlement carries over to the administration of these congressionally imposed laws. Since the Executive Branch of government is led by a President and Vice President for whom the U.S. citizens of Puerto Rico cannot vote, they are deprived of any influence as to how or by whom these laws will be administered.

Juan R. Torruella, *Ruling America's Colonies: The Insular Cases*, 32 Yale L. & Pol'y Rev. 57, 82 (2013) (emphasis in original).

This is a reality that still exists and permeates every level of society including all types of geopolitical considerations such as the one treated here. We know that history develops and that one has to be careful not to ascribe improper motives in retrospect; however, the sad reality is that these considerations and the lack of adequate information on the part of federal decisionmakers continue to affect not only programs such as Ryan White, but also many other aspects of the life of territorial residents, irrespective of whether they were born on the island or born in the continental United States.

HHS has an obligation to show "a rational exercise of deliberative decisionmaking." *Assoc. Fisheries*, 127 F.3d at 111. We find that HHS abdicated that responsibility, and that the unexplained, unidentified, and unavailable definition of the 1994 boundaries cannot survive arbitrary and capricious review. Therefore, those boundaries are unlawful and henceforth set aside in the Ponce region.

## VII.

## Conclusion

For the foregoing reasons, we **GRANT IN PART** and **DENY IN PART** Plaintiffs' request for relief. We **DENY** Plaintiffs' request for Fiscal Year 2014 funds on the grounds of mootness (*see* Part V *supra*). We **GRANT** Plaintiffs' request for a declaration that the boundaries of the Ponce TGA are unlawful as they now stand.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 12th day of August, 2014.

S/José Antonio Fusté
JOSE ANTONIO FUSTE
U. S. DISTRICT JUDGE